IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

THOMAS BRADHAM,

    Plaintiff,                                   Case No. 2:13-cv-1020
                                                JUDGE GREGORY L. FROST
v.                                            Magistrate Judge Norah McCann King

FAIRFIELD COUNTY
JOB & FAMILY SERVICES, et al.,

    Defendants.

**OPINION AND ORDER**

This matter is before the Court for consideration of Defendants' motion for summary judgment (ECF No. 50), Plaintiff's response in opposition (ECF No. 63), and Defendants' reply memorandum (ECF No. 64). For the reasons that follow, the Court **GRANTS** the motion.

**I.     BACKGROUND**

This case involves the sad story of a minor child, S.B., who was abused by a family member and placed in a foster home. S.B.'s biological father, Thomas Bradham, brings this action on S.B.'s behalf and alleges that Fairfield County Job & Family Services ("JFS") and three JFS employees violated S.B.'s rights by allowing him to suffer injuries while in foster care. A brief summary of the facts underlying this action is below.

When S.B. was three or four years old, his biological parents lost custody of him and his younger brother. S.B. went to live with a great-aunt, who physically abused him. S.B. was removed from his great-aunt's custody and came under the jurisdiction of JFS.

JFS placed S.B. and his brother in the foster home of Rod and Angie Young. It is undisputed that the Youngs had been licensed foster parents for several years at that time, were up to date on all training requirements, and previously had fostered seven children through JFS

1

without incident.  Plaintiff does not allege or assert that anything in the Youngs' background provided cause for concern.

Defendant April Wagner was the JFS caseworker assigned to S.B.'s case.  Caseworker Wagner conducted monthly visits of the Youngs' home and occasionally transported S.B. and his brother to and from their appointments.  Caseworker Wagner testified that she wanted the boys to trust her and feel they could come to her with their concerns.

Defendant Valerie Carpico was Ms. Wagner's direct supervisor at JFS.  There is no evidence that Ms. Carpico took any action relevant to the facts of this case; instead, Plaintiff appears to have named her as a defendant because she failed to take any action regarding S.B.

Melinda Winegardner, a non-party, was another JFS caseworker who worked with the Youngs and their other foster children.  Ms. Winegardner interviewed the Youngs in July 2011 in connection with the renewal of the Youngs' foster care license.  Ms. Winegardner found that the Youngs were fit to continue as foster care parents.

The facts underlying this lawsuit began in March of 2011, when JFS placed then-five-year-old S.B. and his brother in the Youngs' home.  S.B. was, according to Mrs. Young, a loveable child who was eager to please.  Mrs. Young testified that S.B. would lie about minor things but, knowing that he had been abused and likely was trying to stay out of trouble, Mrs. Young was not concerned.

S.B.'s behavior began to change after he started visiting his biological grandparents and his biological father in the summer of 2011.  Mrs. Young testified that S.B. would come home from the visits and ask when he was going to live with his biological family.  Upon hearing that he was not going to live with his biological family or that he did not have a visit scheduled in a certain week, S.B. would become withdrawn.

Mrs. Young also testified that, around this same time, S.B. began to develop an obsession with food. Mrs. Young opined that the obsession arose because S.B.'s biological grandparents and biological father let S.B. eat whatever he wanted, while the Youngs limited S.B.'s ability to eat junk food. Plaintiff, on the other hand, characterizes S.B.'s obsession with food as a sign that he was hungry and that the Youngs were not properly feeding him.

Mrs. Young testified that S.B. became more and more emotionally withdrawn in the late summer and early fall of 2011. S.B. would go into a "flat affect" in that he would stare into space, become unresponsive, and fail to register emotions. Mrs. Young relayed her observations of this behavior to Caseworker Wagner.

In addition to the flat affect, Mrs. Young testified that S.B. began to fabricate stories of abuse. In one incident, for example, Mrs. Young's sister-in-law told S.B. he could not get ice cream. S.B. responded by stating that Mrs. Young had choked him. When asked about his comment, S.B. clarified that Mrs. Young had touched his neck on a prior occasion. In another incident, S.B. scratched his stomach with a paper clip and informed a teacher that Mrs. Young had done it. Mrs. Young, who worked at the school S.B. attended, spoke to the school and denied having scratched S.B. Caseworker Wagner testified that S.B. told her he "had told on [Mrs. Young] to get her in trouble." (ECF No. 57, at PAGEID # 594.)

Following the paper clip incident, in September 2011, Mrs. Young contacted Caseworker Wagner to express frustrations about S.B. According to Mrs. Young, she and her husband were concerned about keeping S.B. because his allegations could affect her job. The Youngs also were considering adopting two of their younger foster children at that time and did not want S.B.'s allegations to negatively impact the adoption process.

3

On September 13, 2011, Caseworker Winegardner (who is not a party to this lawsuit) made a note that S.B. told his biological grandparents that his foster parents punished him by making him stand outside in the dark. S.B.'s biological father, Plaintiff Bradham, testified that S.B. also made the same allegation to him.

Caseworker Winegardner called Mrs. Young to address the issue. Mrs. Young denied ever sending S.B. or his brother outside as punishment. Caseworker Winegardner noted that Mrs. Young was upset by the allegation and wanted S.B.'s biological grandparents to know that he was safe in the Youngs' home.

In late September of 2011, Caseworker Wagner conducted her monthly visit to the Youngs' home, where she noticed S.B.'s flat affect. Caseworker Wagner's notes from the visit also reflect that "[S.B.] stated that he slept in the bathroom but immediately stated he had lied after stating that." (ECF No. 59-1, at PAGEID # 1135.) During that visit, in S.B.'s presence, Mrs. Young referred to S.B. as a "psychopath."

Concerned about S.B.'s behavior, Mrs. Young's reference to S.B. being a "psychopath," and Mrs. Young's statements that she might not be able to keep S.B., among other things, Caseworker Wagner immediately called a meeting with other JFS employees to discuss S.B.'s placement. It is unclear whether that meeting took place; however, Caseworker Wagner testified that she shared her concerns with Defendant Carpico about S.B.'s placement. Caseworker Wagner also took steps to contact S.B.'s former caregivers as well as S.B.'s therapist to discuss his needs and condition. Caseworker Wagner's notes following the meeting state, "due to [S.B.'s] past and present problems with not always being honest, it is difficult to understand what his needs are." (ECF No. 59-1, at PAGEID # 1135.)

JFS did not remove S.B. or his brother from the Youngs' care at that time. Caseworker Wagner and her colleagues were considering several options, including placing S.B. in a treatment home and offering respite care to the Youngs. Caseworker Wagner noted that she and Caseworker Winegardner were planning to meet with Mrs. Young at a later time to discuss whether a placement change was appropriate.

On October 20, 2011, both S.B. and his brother were still living in the Youngs' home. Mrs. Young testified that, on that day, she could not find S.B. when she was getting her other children ready to leave the house. Mrs. Young eventually found S.B. lying outside in the rain and cold. It is undisputed that S.B. had been outside for some time, that he contracted hypothermia, and that he went into cardiac arrest.

After finding S.B. unresponsive outside, Mrs. Young took him inside and treated him with warm water. Mrs. Young called her husband (who is an EMT operator) and then called 911. Medical personnel transported S.B. to the hospital, where he was resuscitated and treated. Plaintiff asserts that S.B. suffered lasting injuries from the incident.

Immediately following this incident, JFS removed S.B., his brother, and the Youngs' other foster children from their care. S.B. and his brother eventually were returned to their biological father, Plaintiff Bradham.

Plaintiff filed this lawsuit against Defendants Wagner and Carpico in their individual capacities.[1] Plaintiff asserts that Defendants Wagner and Carpico violated S.B.'s Fourteenth

---

[1] Plaintiff also sued JFS and its director, Michael Orlando, but subsequently abandoned those claims. *See* ECF No. 63, at 12.

Amendment right to substantive due process by failing to remove S.B. from the Youngs' care prior to October 20, 2011.[2]

Most of Plaintiff's evidence in this case revolves around S.B.'s statements and deposition testimony. When he awoke at the hospital on October 20, 2011, S.B. told hospital staff that the Youngs had been abusing him. *See* ECF No. 63-4, at PAGEID # 1163–64. S.B. stated that he was made to stand outside as punishment on more than one occasion. S.B. also stated that the Youngs threw him down the stairs and forced him to do push-ups with tongs underneath his abdomen (meant to injure S.B. if he lowered his abdomen).

Both Mr. and Mrs. Young deny all allegations of abuse. Notably, one counselor testified that she was informed that S.B.'s great-aunt had abused him by pinching his stomach with tongs before he came to live with the Youngs. Caseworker Wagner testified that, to this day, she does not know if the Youngs abused S.B.

Aside from the issue of whether the Youngs abused S.B., one of the disputed issues in this case is what Caseworker Wagner knew prior to October 20, 2011. It is undisputed that Caseworker Wagner knew Mrs. Young had called S.B. a psychopath in S.B.'s presence. Plaintiff suggests that Caseworker Wagner also knew that the Youngs were punishing S.B. by making him stand outside in the cold. In support of that statement, Plaintiff cites Caseworker Winegardner notes regarding S.B.'s accusation, as well as the following passage from S.B.'s deposition testimony:

Q. Did you ever tell April about having to go outside?

A. Yes.

---

[2] Plaintiff expressly concedes that any additional claims that could be gleaned from his complaint are moot. *See* ECF No. 63, at 12 ("The only claim remaining before this Honorable Court is whether Wagner and Carpico deprived S.B. of his rights under Fourteenth Amendment to the United States Constitution to substantive due process of law.")

Q. And what did she say?

A. She said -- she only said okay.

(ECF No. 52, at PAGEID # 361.)

Caseworker Wagner submitted a sworn affidavit stating that, although she had plenty of opportunities to observe and speak with S.B., she never saw any suggestion that the Youngs were abusing him.  Caseworker Wagner similarly did not receive any indications of abuse from S.B.'s therapist, with whom Caseworker Wagner was in constant communication during that time.

Defendant Carpico also submitted a sworn affidavit stating that her role did not involve direct contact with foster children.  Defendant Carpico was responsible for supervising caseworkers such as Caseworker Wagner.  At all times relevant, Defendant Carpico was satisfied that Caseworker Wagner was properly monitoring S.B.'s case.

Defendants moved for summary judgment on Plaintiff's claim.  That motion is now ripe for the Court's consideration.

## II.     ANALYSIS

### A.  Standard of Review

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *See Muncie Power Prods., Inc. v. United Tech. Auto., Inc.*, 328 F.3d 870, 873 (6th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

In viewing the evidence, the Court must draw all reasonable inferences in favor of the nonmoving party, which must set forth specific facts showing that there is a genuine issue of material fact for trial. *Id.* (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)); *Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 234 (6th Cir. 2003). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Muncie*, 328 F.3d at 873 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Consequently, the central issue is " 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " *Hamad*, 328 F.3d at 234–35 (quoting *Anderson*, 477 U.S. at 251–52).

### B.  Fourteenth Amendment Claim

Plaintiff's claim invokes the Fourteenth Amendment's guarantee of substantive due process. Pursuant to the Fourteenth Amendment's Due Process Clause, individuals have certain fundamental rights that the government cannot infringe absent a compelling interest. *See, e.g., Bartell v. Lohiser*, 215 F.3d 550, 557 (6th Cir. 2000). Section 1983 of the United States Code, Chapter Forty-Two, provides a claim for relief for individuals whose substantive due process rights have been violated. *See* 42 U.S.C. § 1983.

The Fourteenth Amendment's Due Process Clause generally does not protect citizens against the actions of private persons. *Pahssen v. Merrill Cmty. Sch. Dist.*, 668 F.3d 356, 366 (6th Cir. 2012). There are limited exceptions to this rule. "One such exception covers 'certain 'special relationships' created or assumed by the State with respect to particular individuals, which may give rise to such an affirmative duty and are enforceable through the Due Process [C]lause to provide adequate protection.' " *Id.* (quoting *Soper v. Hoben*, 195 F.3d 845, 852 (6th

8

Cir. 1999)).  The Sixth Circuit has held that such a "special relationship" exists between certain government officials and children in foster care.  *See Meador v. Cabinet for Human Res.*, 902 F.2d 474 (1990).  Specifically, "due process extends the right to be free from the infliction of unnecessary harm to children in state-regulated foster homes."  *Id.*

Even if a child suffers harm in a state-regulated foster home, however, state officials cannot be liable for that injury unless they acted with the requisite degree of culpability.  *See, e.g., id.*; *Lintz v. Shipski*, 25 F.3d 304, 305 (6th Cir. 1994).  The requisite degree of culpability in the Sixth Circuit is that of "deliberate indifference."  *Lintz*, 25 F.3d at 305; *see also Moore v. Lake Cty. Dep't of Job & Family Servs.*, 364 F. App'x 194, 198 (6th Cir. 2010) (reaffirming that "deliberate indifference" is the prevailing standard in Fourteenth Amendment § 1983 claims and rejecting the plaintiff's request to adopt a "professional judgment" standard of liability).

Defendants argue that they cannot be liable for S.B.'s injuries because they are qualifiedly immune from suit.  The doctrine of qualified immunity provides that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (citing *Procunier v. Navarette*, 434 U.S. 555, 565 (1978)).  To determine if qualified immunity applies, a court must ask whether: (1) considering the evidence in the light most favorable to the party injured, a constitutional right has been violated, and (2) that right was clearly established.  *Range v. Douglas*, 763 F.3d 573, 588 (6th Cir. 2014) (citing *McKenna v. Edgell*, 617 F.3d 432, 438 (6th Cir. 2010) (internal quotations omitted)); *see also Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (explaining that, at the summary judgment stage, inferences regarding a qualified immunity analysis must be drawn in favor of the nonmovant).

Applying those standards in this case, the first question for the Court is whether the evidence supports a finding that Defendants acted with deliberate indifference regarding S.B. The Court finds that it does not.  As explained below, even considering the evidence in the light most favorable to Plaintiff and drawing all inferences in his favor, the Court finds that Defendants did not act with deliberate indifference as a matter of law.

In the Sixth Circuit, failing to remove a child from a foster home immediately after learning of an allegation of abuse is not deliberate indifference.  *See Lintz*, 25 F.3d at 307.  In *Lintz*, for example, a social worker was aware that children in foster care made specific allegations of sexual abuse and were exhibiting behaviors consistent with those allegations.  *See id*. at 306–07.  The social worker did not immediately remove the children from the home but instead set up safeguards in the home to prevent further abuse and began looking for a new home in which to place the children.  *See id*.  Because of those actions, the fact that the social worker had not witnessed the abuse but had "only an accusation to rely on," and the fact that the alleged abuser denied the allegations, the Sixth Circuit found that the social worker had not acted with deliberate indifference.  *Id*. at 307.

The Sixth Circuit's decision in *Lintz* is consistent with comments from the Eleventh Circuit in *Taylor v. Ledbetter*, 818 F.2d 791 (11th Cir. 1987) (en banc), which the *Lintz* court cited.  In *Taylor*, the Eleventh Circuit suggested that a social worker does not act with deliberate indifference unless he or she has "actual knowledge of abuse" or "deliberately fail[s] to learn what was occurring in the foster home." 818 F.2d at 796.

These cases mark a clear distinction between a social worker who has personal knowledge of abuse and one who has knowledge of an *accusation* of abuse.  In the latter case, if the social worker takes steps to investigate the allegation and/or reevaluate the child's placement

10

before physically removing the child from the home, the officer has not acted with deliberate indifference.  *See Lintz*, 25 F.3d at 307; *accord Taylor*, 818 F.2d at 796.

This observation is consistent with other decisions from the Sixth Circuit, *Davis v. Brady*, 143 F.3d 1021, 1026 (6th Cir. 1998) and *Stemler v. City of Florence*, 126 F.3d 856, 870–71 (6th Cir. 1997), which Plaintiff cites in support of his position.  In both *Davis* and *Stemler*, the court found sufficient evidence to support a finding of deliberate indifference when police officers exposed an individual to a known risk of harm.  *See Davis*, 143 F.3d at 1026 (officers drove a man to a dark, busy highway and abandoned him despite the fact that he was visibly drunk and unable to care for himself); *Stemler*, 126 F.3d at 870–71 (officers physically placed a woman in her boyfriend's car when the officers observed or should have been able to observe that the boyfriend was unfit to drive).  Those cases—in which the officers had personal knowledge of the risk rather than an accusation—are distinguishable from *Lintz* and the Eleventh Circuit's comments in *Taylor*.

Cases such as *Davis* and *Stemler* are distinguishable from cases involving foster children for other reasons.  In the foster care setting, a social worker can only remove children from a foster home if another suitable placement exists.  *See, e.g., Lintz*, 25 F.3d at 307 (indicating that the social worker had to find a suitable home in which all three children could stay together).  That scenario is different from the facts at issue in *Davis* and *Stemler*, in which the evidence suggested that the officers had other options but affirmatively chose to place the individuals in harm's way.  *See Davis*, 143 F.3d at 1026; *Stemler*, 126 F.3d at 870–71.  The Sixth Circuit's opinion in *Lintz* accounts for the nuanced decisions that social workers face.

Here, the most Plaintiff can prove is that, in September of 2011, Defendants knew S.B. had accused the Youngs of punishing him by making him stand outside.  Applying the authority

set forth above, Defendants' failure to immediately remove S.B. from the home after learning of that accusation is not deliberate indifference as a matter of law.

Plaintiff argues that these facts should have triggered a duty to investigate and that, because Defendants took no such action, their actions can be characterized as deliberately indifferent. But it is unclear whether S.B.'s accusation was enough to trigger any such duty. Not only is S.B.'s allegation much less clear than the allegation of sexual abuse in *Lintz*, but S.B.'s allegation also was unaccompanied by any behavioral evidence or indicia of reliability (as opposed to the accusation in *Lintz*, which was accompanied by the children acting out sexually). Here, Caseworker Wagner had witnessed S.B. being untruthful in the past, Mrs. Young had reported previous incidents of S.B. fabricating stories of abuse, and S.B. had expressed a desire to get Mrs. Young in trouble. It simply is unclear whether Defendants' knowledge of S.B.'s accusation could support a finding of deliberate indifference even if Defendants had done nothing in response.

The Court need not resolve that issue, however, because the undisputed evidence shows that Defendants took steps to address the accusation. Caseworker Winegardner called Mrs. Young to discuss the accusation and Mrs. Young denied the same. Then, following the in-home meeting in late September 2011, Caseworker Wagner called an internal meeting to discuss her concerns with S.B.'s placement. Caseworker Wagner contacted a previous caregiver and S.B.'s therapist to better understand his needs. Caseworker Wagner also planned to follow up with Mrs. Young and offer respite or possibly relocate S.B. and his brother. These steps, combined with the fact that Caseworker Wagner had a history of transporting S.B. and his brother to their appointments so they would feel comfortable confiding in her, show that Defendants did not deliberately fail to learn what was occurring in the Youngs' home.

Plaintiff's additional evidence—that Caseworker Wagner heard Mrs. Young refer to S.B. as a "psychopath" and that JFS knew a family member of the Youngs said he saw the devil in S.B.—similarly do not establish deliberate indifference.  Plaintiff provides no authority to suggest that an isolated instance of verbal abuse (if Mrs. Young's statement qualifies as such) should have triggered Defendants to remove S.B. from the home or investigate the situation more than they already were.  Given the options available to Defendants at that point, a reasonable jury could not conclude that Defendants acted with deliberate indifference by choosing to gather information and discuss the best possible course of action for S.B.

Having found that there exists no evidence of deliberate indifference as a matter of law, the Court need not address Defendant Carpico's additional arguments regarding supervisory liability.  Defendants are entitled to summary judgment on Plaintiff's claim.

### III. CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendants' motion for summary judgment.  (ECF No. 50.)  The Clerk is **DIRECTED** to enter judgment accordingly and remove this case from the docket records of the United States District Court for the Southern District of Ohio, Eastern Division.

**IT IS SO ORDERED.**

>  **/s/ Gregory L. Frost**
>  **GREGORY L. FROST**
>  **UNITED STATES DISTRICT JUDGE**